**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| TRACI DUFF | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| JOHNSON & JOHNSON INC., and | ) | |
| ETHICON, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff, TRACI DUFF ("Plaintiff"), by and through her attorneys of record, and files this Original Complaint and Jury Demand against Defendants JOHNSON & JOHNSON INC. and ETHICON, INC. ("Defendants") and states as follows:

### PARTIES

1.     This action seeks to recover damages for the injuries sustained by Traci Duff ("Plaintiff") as the direct and proximate result of the wrongful conduct and negligence of the Defendants in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distributing, labeling, and selling of the Gynecare Sling manufactured by Ethicon, Inc., a subsidiary of Johnson & Johnson, implanted in the Plaintiff.

2.     Plaintiff Traci Duff is a citizen and resident of the State of North Carolina, County of Johnston, and Princeton.

3.     Defendant JOHNSON & JOHNSON ("J&J") is a corporation, and according to its website, the world's largest and most diverse medical device, and diagnostics company, with its worldwide headquarters and principle place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. Johnson &

Johnson organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing, promotion, training, distribution, and sale of its' pelvic floor repair products. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." The Ethicon Franchise was charged by J&J with the design, development, promotion, marketing, testing, training, distribution, and sale of the pelvic floor repair products at issue in this case. The Company Group Chairman and Worldwide Franchise Chairman for the Ethicon Franchise, Vladimir Makatsria, is employed by J&J and include, but are not limited to, Ethicon Franchise are thus controlled by J&J and include, but are not limited to, Ethicon Inc., Ethicon LLC, Ethicon LTD.

4.     Defendant, ETHICON, INC., is a wholly owned subsidiary of Defendant J&J with its headquarters and principle place of business located in Somerville, New Jersey.

5.     At all times relevant herein, J&J and Ethicon, Inc., were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling such devices, including the Gynecare Sling implanted in Plaintiff. At all times relevant hereto, and, upon information and belief, J&J, and Ethicon Inc., manufactured, marketed advertised, promoted, and sold the Gynecare Sling worldwide.

6.     Defendants J&J and Ethicon, Inc., (hereinafter referred to collectively as "Defendants") had a legal duty to ensure the safety and effectiveness of their pelvic mesh products by conducting adequate and well-controlled studies on their products prior to marketing. Defendants deliberately chose to manipulate the only studies that were conducted on their products and by so doing provided doctors and patients in the United States with accurate information regarding the lack of proof of the safety and effectiveness of their pelvic mesh products.

## JURISDICTION AND VENUE

7.      Federal subject matter jurisdiction in the constituent actions is based upon 28 U.S.C. § 1332(a), in that there is complete diversity among Plaintiff and Defendants and the amount in controversy exceeds $75,000.

8.      Defendants have significant contacts with the United States District Court for the Eastern District of North Carolina such that they are subject to the personal jurisdiction of the court in said district.

9.      A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in in the United States District Court for the Eastern District of North Carolina. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said district.

## FACTUAL BACKGROUND

10.     Surgical mesh products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical mesh products designed for hernia repair for abdominal repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of pelvic organ prolapse (POP") and stress urinary incontinence ("SUI"). Manufacturers, including Defendants, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP and SUI. Today, Defendants sell pelvic mesh "kits" which can include not only the surgical mesh, but also tissue fixation anchors and insertion tools. The Gynecare Sling manufactured by Defendants (hereinafter referred to as the "Mesh Products") is considered Class II medical devices.

11.     The Mesh Products are targeted for women who suffer from stress urinary incontinence as a result of the weakening or damage caused to the walls of the vagina. These products are specifically promoted to physicians and patients as an innovative, permanent, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma and minimal pain

while permanently correcting, stress urinary incontinence.

12.     Moreover, these Mesh Products contain polypropylene mesh. Despite claims that this material is inert, the scientific evidence shows that this mesh material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving The Mesh Products. This immune response promotes degradation of the polypropylene mesh, as well as the pelvic tissue, and can contribute to the formation of severe adverse reactions to the mesh.

13.     At various times, Defendants sought and obtained Food and Drug Administration ("FDA") clearance to market the Mesh Products under Section 51O(k) of the Medical Device Amendment. Section 51O(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. This clearance process did not require Defendants to prove the safety or efficacy of the Mesh Products and, thus, a formal review of the safety and efficacy of the Mesh Products were never conducted with regard to the Products.

14.     At all times relevant hereto, The Mesh Products were marketed to the medical community, including Plaintiff's implanting physician, and directly to patients as safe, effective, permanent, reliable, medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, primarily, stress urinary incontinence, pelvic organ prolapse, and as safer and more effective as compared to the traditional products and procedures for treatment.

15.     Upon information and belief, the Defendants have consistently underreported and withheld information about the propensity of the Mesh Products to fail and cause injury and complications, and have misrepresented the efficacy and safety of the Mesh Products, through various means and media, actively and intentionally misleading the FDA, the medical community, patients, and the public at large.

16.     Despite the chronic underreporting of adverse events associated with the Mesh Products, eventually enough complaints were recorded for the FDA to issue a public health notification regarding the dangers of these devices.

17.     On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that "serious complications associated with surgical mesh for transvaginal repair of POP are not rare" (emphasis in the original).

18.     The FDA Safety Communication also stated, "Mesh contraction (shrinkage) is a previously unidentified risk of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

19.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologist Society ("AUGS") also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating: There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh. Some of these women

will require surgical intervention to correct the condition, and some of the pain appears to be intractable.

20.     The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

21.     Plaintiff's type of injuries were reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion. 23. The FDA Safety Communication further indicated that the benefits of using transvaginal mesh products instead of other feasible alternatives did not outweigh the associated risks.

22.     Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk."

23.     Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologist Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the "White Paper"). In the White Paper, the FDA noted that the published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh- related complications that are not experienced by patients who undergo traditional surgery without mesh."

24.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginal placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk." (Emphasis in original).

25.     The FDA White Paper further stated that "these products are associated with serious adverse events. Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non- mesh repair."

26.     In its White Paper, the FDA advises doctors to, inter alia, "Recognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications."

27.     The FDA concludes the White Paper by stating that it "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

28.     Defendants knew or should have known about the Mesh Products' risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

29.     Defendants knew or should have known that the Mesh Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

30.     Defendants had sole access to material facts concerning the defective nature of the Mesh Products and their propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons who used the Mesh Products.

31.     The scientific evidence shows that the material from which the Mesh Products are made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the Mesh Products, including Plaintiff.

32.     This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Plaintiff.

33.     The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an Issue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Mesh Products were unreasonably susceptible to degradation and fragmentation inside the body.

34.     The Mesh Products were unreasonably susceptible to shrinkage and contraction inside the body.

35.     The Mesh Products were unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

36.     At all times relevant hereto, the Mesh Products were marketed to the medical community and to patients, including Plaintiff and her implanting physician, as safe, effective, reliable, medical devices, implanted by safe and effective, minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of stress urinary incontinence, and other competing products.

37.     Defendants omitted the risks, dangers, defects, and disadvantages of the Mesh Products, and advertised, promoted, marketed, sold, and distributed the Mesh Products as a safe medical device when Defendants knew or should have known that the Mesh Products were not safe for their intended purposes, and that the Mesh Products would cause, and did cause, serious medical problems, and in some patients, including Plaintiff, catastrophic injuries.

38.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, the Mesh Products have high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused

severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making these products defective under the law.

39.     The specific nature of the Mesh Products' defects includes, but are not limited to, the following:

> a. the use of polypropylene material in the Mesh Products and the immune reactions that result from such material, causing adverse reactions and injuries.
>
> b. the design of the Mesh Products to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries.
>
> c. biomechanical issues with the design of the Mesh Products, including, but not limited to, the propensity of the Mesh Products to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury.
>
> d. the use and design of arms and anchors in the Mesh Products, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region.
>
> e. the propensity of the Mesh Products for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body.
>
> f. the inelasticity of the Mesh Products, causing them to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking).

g. the propensity of the Mesh Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

h. the hyper-inflammatory responses to polypropylene leading to problems including chronic pain and fibrotic reaction.

i. the adverse tissue reactions caused by the polypropylene products, which are causally related to infection, as the polypropylene is a foreign material to the human body.

j. the harshness of cross-linked polypropylene upon the female pelvic tissue, and the hardening of the product in the body.

k. the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturers' instructions.

40. The Mesh Products are also defective due to Defendants' failure to adequately warn or instruct Plaintiff and her implanting physician of subjects including, but not limited to, the following:

a. the Mesh Products' propensities to contract, retract, and/or shrink inside the body.

b. the Mesh Products' propensities for degradation, fragmentation and/or creep.

c. the Mesh Products' inelasticity preventing proper mating with the pelvic floor and vaginal region.

d. the rate and manner of mesh erosion or extrusion.

e. the risk of chronic inflammation resulting from the Mesh Products.

f. the risk of chronic infections resulting from the Mesh Products.

g. the risk of permanent vaginal or pelvic scarring as a result of the Mesh Products.

h. the risk of recurrent, intractable pelvic pain and other pain and other pain resulting from the Mesh Products.

i. the need for corrective or revision surgery to adjust or remove the Mesh Products.

j. the severity of complications that could arise as a result of implantation of the Mesh Products.

k. the hazards associated with the Mesh Products.

l. the Mesh Products' defects described herein.

m. treatment of stress urinary incontinence with the Mesh Products is no more effective than feasible available alternatives.

n. treatment of stress urinary incontinence with the Mesh Products exposes patients to greater risk than feasible available alternatives.

o. treatment of stress urinary incontinence with the Mesh Products makes future surgical repair more difficult than feasible available alternatives.

p. uses of the Mesh Products put the patient at greater risk of requiring additional surgery than feasible available alternatives.

q. removal of the Mesh Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.  complete removal of the Mesh Products may not be possible and may not result in complete resolution of the complications, including pain.

41.  Defendants have underreported information about the propensity of the Mesh Products to fail and cause injury and complications and have made unfounded representations regarding the efficacy and safety of the Mesh Products through various means and media.

42.  Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Mesh Products.

43.  Defendants failed to design and establish a safe, effective procedure for removal of the Mesh Products, or to determine if a safe, effective procedure for removal of the Mesh Products exists.

44.  Feasible, safer, and suitable alternatives to the Mesh Products have existed at all times relevant, including at the time of manufacture, that do not present the same frequency or severity of risks as do the Mesh Products. Some of these feasible and suitable alternatives include but are not limited to:

a.  The use of sutures, including delayed absorbable sutures like PDS, in colposuspension procedure like the Burch.

b.  autologous facia sling.

c.  an allograft sling such as Repliform; and

d.  a sling with less polypropylene such as Ultrapro

e.  corrective surgery without the use of mesh.

45.  The Mesh Products were at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

46.     Defendants provided incomplete and insufficient training and information to physicians regarding the use of the Mesh Products and the aftercare of patients implanted with the Mesh Products.

47.     The Mesh Products implanted in Plaintiff were in the same or substantially similar condition as they were when they left Defendants' possession, and in the condition directed by and expected by Defendants.

48.     The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Mesh Products include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and chronic pelvic pain.

49.     In many cases, including Plaintiff's, the women have been forced to undergo extensive medical treatment, including, but not limited to operations to located and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine and the vagina, and operations to remove portions of the female genitalia.

50.     The medical and scientific literature studying the effects of Defendants' mesh products, like that of the Mesh Products implanted in Plaintiff, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the Mesh Products.

51.     Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

52.     At all relevant times herein, Defendants continued to promote the Mesh Products as safe and effective even when no clinical trials had been done supporting long- or short-term efficacy.

53.     In doing so, Defendants failed to disclose to Plaintiff, Plaintiff's healthcare providers, and the medical community, the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Mesh Products.

54.     At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff, Plaintiff's implanting physician, and the medical community, on notice of the dangers and adverse effects caused by implantation of the Mesh Products.

55.     Defendants had a duty to exercise reasonable and ordinary care in the recruitment and training of physicians to implant the Mesh Product

56.     The Mesh Products as designed, manufactured, distributed, sold and/or supplied by Defendants were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of safety.

57.     Defendants knew that the Mesh Products, as designed, manufactured, distributed, sold and/or supplied by Defendants, were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing.

58.     Defendants' aforementioned acts and omissions constitute willful and or wanton conduct.

59.     The Mesh Products, as designed, manufactured, distributed, sold and/or supplied by Defendants, were defective as marketed at the time they left Defendants' control.

60.     On or about March 28, 2012, Plaintiff had the Mesh Product implanted at Johnston Medical Center, in Smithfield, North Carolina to treat her stress urinary incontinence.

61.     Thereafter, Plaintiff began experiencing painful and serious complications, including but not limited to, constant and excruciating, pelvic and abdominal pain; cramping; vaginal bleeding; dyspareunia, incontinence, and mesh erosion.

62.     In July of 2020, Plaintiff underwent an operation at UNC Hospital Hillsborough Campus in Hillsborough, North Carolina, for a partial removal of the Mesh product.

63.     As a result of having the Mesh Products implanted in her, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

**Fraudulent Concealment**

64.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through affirmative misrepresentations and omissions, actively concealed from Plaintiff, Plaintiff's physicians, the medical community, and the general public the true risks associated with the Defendants' mesh products, including the Mesh Products implanted in Plaintiff.

65.     As a result of Defendants' actions, Plaintiff, and her implanting physician were unaware, and could not reasonably have known or have learned through reasonable diligence, that they had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

**COUNT I: NEGLIGENCE - DESIGN DEFECT**

66.     Plaintiff hereby incorporates by reference all previous paragraphs and further states as follows:

67.     Plaintiff is an expected and ordinary user or consumer of the Mesh Products.

68.     The Mesh Products implanted in Plaintiff were conveyed in a condition not contemplated by reasonable persons among those considered expected users or consumers of the Mesh Products.

69.     Safer, feasible and suitable alternatives to the Mesh Products that were available to the Defendants have existed at the time of manufacture and conveyance that do not present the same frequency or severity of risks as does the Mesh Product. Safer and feasible alternatives include but are not limited to, human tissue slings, biological implants, native tissue repair, sutures, slings with less polypropylene, corrective surgery without implanted mesh, and pelvic floor therapy.

70.     The burden of implementing safer, feasible, and alternative designs would not have outweighed the reduction of injury caused to consumers, including Plaintiff.

71.     At the time of manufacture and conveyance, the Mesh Products failed to meet the minimum safety expectations of the ordinary user and consumer: Plaintiff expected that the Mesh Products would treat and/or remedy her urinary incontinence and without causing the aforementioned serious and painful complications.

72.     The ordinary user and consumer would not consider the Mesh Products sufficiently safe given the aforementioned risks, dangers, and complications associated with the Mesh Products.

73.     The aforementioned and foreseeable risks exceed and outweigh the benefit the Defendants purports the Mesh Products provides, that benefit being the treatment of stress urinary incontinence.

74.     Defendants had a duty to individuals, including Plaintiff, to use reasonable care in designing, marketing, labeling, packaging, and selling the Mesh Products.

75.     Defendants breached their duty to Plaintiff by failing to exercise due care under the circumstances.

76.     Defendants knew or should have known Plaintiff could foreseeably suffer injury as a result of the defective design of the Mesh Products.

77.     The Mesh Products implanted in Plaintiff were, at the time conveyed, not in conformity with the generally recognized state of the art applicable to the safety of the Mesh Products at the time they were designed, manufactured, packaged, labeled, and/or sold.

78.     The Mesh Products implanted in Plaintiff were not reasonably safe for their intended uses and were defective as described herein with respect to their design. As previously stated, the Mesh Products' design defects include, but are not limited to:

  a.  the use of polypropylene material in the Mesh Products and the immune reaction that results from such material, causing adverse reactions and injuries.

  b.  the design of the Mesh Products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries.

  c.  biomechanical issues with the design of the Mesh Products, including, but not limited to, the propensity of the Mesh Products to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury.

  d.  the use and design of arms and anchors in the Mesh Products, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region.

  e.  the propensity of the Mesh Products to "creep," or to gradually elongate and deform when subject to prolonged tension inside the body.

f.  the inelasticity of the Mesh Products, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation).

g.  the propensity of the Mesh Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

h.  the hyper-inflammatory responses to polypropylene leading to problems including chronic pain and fibrotic reaction.

i.  the adverse tissue reactions caused by the polypropylene products, which are causally related to infection, as the polypropylene is a foreign material to the human body.

j.  the harshness of cross-linked polypropylene upon the female pelvic tissue, and the hardening of the product in the body; and

k.  the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

79.  Defendants were negligent in failing to use reasonable care as described herein in designing, marketing, labeling, packaging, and selling the Mesh Products. Defendants breached their aforementioned duty by:

a.  Failing to design the Mesh Products so as to avoid an unreasonable risk of harm to women in whom the Mesh Products were implanted, including Plaintiff.

b. Failing to manufacture the Mesh Products so as to avoid an unreasonable risk of harm to women in whom the Mesh Products were implanted, including Plaintiff.

c. Failing to use reasonable care in the testing of the Mesh Products so as to avoid an unreasonable risk of harm to women in whom the Mesh Products were implanted, including Plaintiff.

d. Failing to use reasonable care in inspecting the Mesh Products so as to avoid an unreasonable risk of harm to women in whom the Mesh Products were implanted, including Plaintiff.

e. Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Mesh Products.

80. As a direct and proximate result of the Plaintiff being implanted with the Mesh Products' aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including multiple procedures to correct her injuries and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including but not limited to obligations for medical services and expenses, and/or lost income and other damages.

81. As a direct and proximate result of Defendants' negligence as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## COUNT II: NEGLIGENCE - FAILURE TO WARN

82.    Plaintiff hereby incorporates by reference all previous paragraphs and further states as follows:

83.    Defendants had a duty to exercise reasonable care in the advertising and sale of the Mesh Product, including a duty to warn and instruct Plaintiff's implanting physician, of the dangers associated with the use of the Mesh Products that were known or should have been known to Defendants at the time of the sale of the Mesh Products to the Plaintiff.

84.    Defendants knew or should have known Plaintiff could foreseeably suffer injury as a result of Defendants failure to exercise ordinary care in providing adequate warnings as described herein

85.    Defendants breached its duty to Plaintiff by failing to exercise due care under the circumstances

86.    The Mesh Products implanted in Plaintiff were not reasonable safe for their intended uses and were defective as described herein as a matter of law due to their lack of appropriate and necessary warnings. Specifically, Defendants negligently failed to provide sufficient or adequate warnings to Plaintiff, Plaintiff's healthcare providers, or the medical community regarding among other subjects:

        a.    the Mesh Products' propensities to contract, retract, and/or shrink inside the body.

        b.    the Mesh Products' propensities for degradation, fragmentation, disintegration and/or creep.

        c.    the Mesh Products' inelasticity preventing proper mating with the pelvic floor and vaginal region.

        d.    the rated and manner of mesh erosion or extrusion.

e.  the risk of chronic inflammation resulting from the Mesh Products.

f.  the risk of chronic infections resulting from the Mesh Products.

g.  the risk of permanent vaginal or pelvic scarring as a result of the Mesh Products.

h.  the risk of recurrent, intractable pelvic pain and other pain resulting from the Mesh Products.

i.  the need for corrective or revision surgery to adjust or remove the Mesh Products.

j.  the severity of complications that could arise as a result of implantation of the Mesh Products.

k.  the hazards associated with the Mesh Products.

l.  the Mesh Products' defects described herein.

m.  treatment of stress urinary incontinence with the Mesh Products is no more effective than feasible available alternatives.

n.  treatment of stress urinary incontinence with the Mesh Products exposes patients to greater risk than feasible available alternatives.

o.  treatment of stress urinary incontinence with the Mesh Products makes future surgical repair more difficult than feasible available alternatives.

p.  the use of the Mesh Products puts the patient at a greater risk of requiring additional surgery than feasible available alternatives.

q.　removal of the Mesh Products due to complications may involve multiple surgeries and may significantly impair the patients' quality of life; and

r.　complete removal of the Mesh Products may not be possible and may not result in complete resolution of the complications, including pain.

87.　Defendants, by excising reasonable diligence, could have made such warnings available to Plaintiff, Plaintiff's healthcare providers, and the medical community.

88.　As a direct and proximate result of Defendants' failure to provide Plaintiff, Plaintiff's healthcare providers, and the medical community with sufficient or adequate warnings, Plaintiff and Plaintiff's healthcare providers were not adequately informed of the potential dangers and/or defects of the Mesh Products.

89.　Had Plaintiff's implanting physician had been adequately warned of the unreasonable dangers and risks of the Mesh Products, Plaintiff's physician would not have recommended the use of the Mesh Products in Plaintiff and/or recommended safer feasible alternatives, and Plaintiff's injuries could have been avoided.

90.　Had Plaintiff's implanting physician been adequately warned of the aforementioned risks, complications, and dangers, Plaintiff's implanting physician would have informed of this information, and Plaintiff would not have consented to the implantation of the Mesh Products.

91.　As a direct and proximate result of the Mesh Products' aforementioned defective warnings as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including multiple procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

92.     As a direct and proximate result of Defendants' negligence, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages

## COUNT III - BREACH OF IMPLIED WARRANTY

93.     Plaintiff hereby incorporates by reference and reavers each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein and further states and alleges as follows:

94.     The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the good and became part of the basis of the bargain creating an implied warranty that the good shall conform to the affirmations of fact or promises.

95.     At the time of making such implied warranties, Defendants knew or should have known that the Mesh Products do not conform to these representations because the Mesh Products were not safe and have numerous side effects, many of which Defendants did not accurately warn about, thus making the Mesh Products unreasonably unsafe for their intended purpose.

96.     Members of the medical community, including physicians and other healthcare professionals, as well as Plaintiff and her implanting physician, relied upon the representations and warranties of Defendants in connection with the use recommendation, description, and/or dispensing of the Mesh Products.

97.     Plaintiff and Plaintiff's implanting physician, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

98.     At all relevant and material times, Defendants manufactured, distributed, advertised, promoted and sold the Mesh Products.

99.     At all relevant times, Defendants intended that the Mesh Products be implanted for the purposes and in the manner that Plaintiff or Plaintiff's implanting physicians in fact used them and Defendants impliedly warranted each product to be of merchantable quality, safe and fit for such use, and was not adequately tested.

100.    At all relevant and material times, Defendants developed, designed, manufactured, labeled, packaged, distributed, marketed, supplied, advertised, sold and otherwise engaged in all activities that are part and parcel of the sale and distribution of its product, the Mesh Products, representing the quality and effectiveness to health care professionals, the FDA, Plaintiff and Plaintiff's implanting physician in such a way as to induce its purchase or use, thereby making an implied warranty that the Mesh Products would conform to the representations. More specifically, Defendants represented that the Mesh Products were safe and effective, that it was safe and effective permanent implant for use by individuals such as Plaintiff, and/or that it was safe and effective to treat Plaintiff's conditions.

101.    Defendants were aware that consumers, including Plaintiff and/or Plaintiff's physicians, would implant the Mesh Products in the manner directed by the instructions for use; which is to say that Plaintiff was a foreseeable user of the Mesh Products.

102.    Plaintiff and/or her physicians were at all relevant times in privity with Defendants.

103.    The Mesh Products were expected to reach and did in fact reach consumers, including Plaintiff or Plaintiff's physicians, without substantial change in the condition in which they manufactured and sold the Mesh Products.

104.    Defendants breached various implied warranties with respect to the Mesh Products, including the following particulars.

        a.      Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters and regulatory submissions that the Mesh Products were safe and fraudulently withheld and concealed information about the substantial risks of serious injury and/or death associated with using the Mesh Products;

        b.      Defendants represented that the Mesh Products were safe, and/or safer than other alternative devices or procedures and fraudulently concealed information, which demonstrated that the Mesh Products were not as safe or safer than alternatives available on the market; and

        c. . Defendants represented that the Mesh Products were more efficacious than other alternative medications and fraudulently concealed information regarding the true efficacy.

105.    In reliance upon Defendants' implied warranty, Plaintiff used the Mesh Products as prescribed and in the foreseeable manner normally intended, recommended, promoted and marketed by Defendants.

106.    Defendants breached their implied warranty to Plaintiff in that the Mesh Products were not of merchantable quality, safe and fit for its intended use, or adequately tested, in violation of Common Law principles.

107.    The Mesh Products implanted in Plaintiff failed to function as intended and as represented by Defendants because they did not relieve the symptoms or otherwise alleviate the medical condition they were intended to permanently treat and/or cure; that being Plaintiff's

urinary incontinence. Instead, the Mesh Products contained the aforementioned defects that caused Plaintiff to suffer painful and serious complications, including but not limited to, constant and excruciating, pelvic and abdominal pain; cramping; vaginal bleeding; dyspareunia, incontinence, mesh erosion and other severe adverse health consequences. Because the Mesh Products failed to conform to representations and were not suitable for the purpose for which they were used, Defendants have breached their implied warranties.

108.    As a direct and proximate result of Defendants' wrongful conduct, including Defendants' breach of implied warranty, Plaintiff has sustained and will continue to sustain severe and debilitating injuries, serious bodily injury, mental and physical pain and suffering and has incurred economic loss.

WHEREFORE, Plaintiff demands a trial by jury, judgment against Defendants for compensatory damages in an amount exceeding $75,000, as well as costs, interest, or any other relief, monetary or equitable, to which they are entitled.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated December 30, 2021

Respectfully Submitted,

By:/s/  John Szymankiewcz
John Szymankiewicz
MATHESON & ASSOCIATES PLLC
127 W Hargett St #100
Raleigh, NC 27601
T: (919)335-5291
john@mathesonlawoffice.com

Fatima Abuzerr (*pro hac to be submitted*)
MOLL LAW GROUP
22 W Washington St, Floor 15
Chicago, IL 60602

T: (312) 462-1700

fabuzerr@molllawgroup.com

**COUNSEL FOR PLAINTIFF**